IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| SHAHRAM SHAKOURI, | § | |
| TDCJ-CID No. 01558021 | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:15cv447 |
| | § | |
| LORIE DAVIS, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT DAVIS'S ANSWER WITH BRIEF IN SUPPORT

In a Texas court, Shakouri was found guilty of aggravated sexual assault and sentenced to twenty-three years in prison. He seeks habeas corpus relief. *See* 28 U.S.C. § 2254 (Westlaw 2016). The petition should be dismissed with prejudice.

## JURISDICTION

This Court has jurisdiction over the subject matter and the parties. *See* 28 U.S.C. §§ 2241 and 2254 (Westlaw 2016).

## PETITIONER'S ALLEGATIONS

Shakouri alleges the following:

I.     He received ineffective assistance when trial counsel failed to

(A)    file a motion to suppress evidence arising from his unlawfully seized computer and flash drive (ECF No. 1 at 6);[1]

(B)    object to the admission of certain evidence (*id.*);

(C)    request a charge on a lesser-included offense (*id.*);

(D)    request a limiting instruction regarding an extraneous offense (*id* at 6–7); and

(E)    object to improper voir dire (*id.* at 7);

II.    He was denied due process with the State or complainant planted evidence (*id.* at 6);

III.    He was denied due process when the State failed to disclose evidence favorable to the defense (*id.* at 8);

IV.    The State used perjured testimony (*id.* at 8); and

V.    He is actually innocent (*id.* at 8).

## GENERAL DENIAL

The Director denies all of Shakouri's assertions of fact except those supported by the record or specifically admitted herein.

## STATEMENT OF THE CASES

In the 219th District Court of Collin County, Texas, Shakouri was found guilty of aggravated sexual assault and was sentenced to twenty-three years

---

[1] "ECF" refers to the documents filed in the district court's electronic case filing system followed by the document number and the page number.

in prison. *State v. Shakouri*, No. 219-80595-07 (Jan. 23, 2009) (CR 183–85).[2]

The conviction and sentence were affirmed on appeal, *Shakouri v. State*, No. 05–09–00158–CR, 2010 WL 3386598 (Tex. App.—Fort Worth Aug. 30, 2010), discretionary review was refused, *Shakouri v. State*, No. PD-0122-11 (Tex. Crim. App. Apr. 6, 2011), and he sought no certiorari review (ECF No. 1 at 3). The Court of Criminal Appeals denied habeas corpus relief without written order on findings of the trial court without a hearing. *Ex parte Shakouri,* No. WR-82,402-01 (Aug. 19, 2015). This petitions follow.

## RECORDS

Records of Shakouri's state appeal and habeas proceedings are being filed with the Court.

## FACTS OF THE OFFENSE

The description of the offense and of the trial are taken from the court of appeals opinion.

> [Shakouri], who had lived in the United States for nearly 30 years, married Afsaneh Marous[3] in Iran in January 2006. After the wedding, [Shakouri] returned to the United States, while Marous and her twelve-year-old son awaited their visas.
>
> In May 2006, Marous and her son arrived in Dallas. That night, Marous alleged [Shakouri] threw her onto the bed, handcuffed her arms above her head and raped her. Marous stated

---

[2] "CR" refers to the clerk's record of papers filed in the trial court followed by the page number.

[3] In the court of appeals opinion, the complainant's surname is given as "Marous." This pleading will use that name throughout. (Footnote added.)

the violence continued during sex, in that [Shakouri] would slap, bite and punch her. Marous also testified that the first time [Shakouri] anally raped her, he put his elbow into her back, pressed her head sideways onto the mattress with his hand and forced his penis into her backside with such force that it displaced the mattress.

She also stated that during anal sex, he would clutch her hair and pull her head back toward him, yanking out her hair and ignoring her complaints. Marous explained that he would press his weight against her so he could bind her ankles to the bed with straps that left marks on her legs. He also used sex toys in her vagina and anus. Marous testified that [Shakouri] seemed to derive pleasure from her pain and explained when [Shakouri] failed to use lubrication for the sex toys, she would bleed.

She complained that if she said "no," he would hit and bite her. Marous testified that [Shakouri] claimed if she said anything to anybody, "[he] would kill [her] and [her] child." She stated she was scared of him and for her son, and tried to appease him to calm him down.

Beth Lyons, a member of the Baha'i church that both [Shakouri] and Marous attended, testified [Shakouri] "was controlling about what [Marous] did, who she got to see, who she got to interact with, [and] who she was allowed to talk to on the phone." Marous testified [Shakouri] would not let her go anywhere by herself. She explained:

> I was like a prisoner in that house. If anybody would want to come to our house, he had to know. If my mom wanted to call me, she has to call during the time he was at home. If I would speak more than ten minutes, he would ask me—be suspicious of me. He would tell me just call on Saturdays or Sunday, that way [he] would be home. He didn't want me to have any contact with my family. He took advantage of me being alone, not having anybody, not having money. I didn't have nothing. No job. I couldn't speak any English. He took advantage of all of this.

After Marous and her son had been in the United States a few months, [Shakouri] moved them to a house in Prosper, but Marous testified [Shakouri] continued to rape and sodomize her with the sex toys. She stated, at one point, she took a home pregnancy test and discovered she was pregnant. She knew [Shakouri] did not want any more children and testified she was scared to tell him. When she did, [Shakouri] was angry and for two "bad days," he raped and punched her on the side. She explained she eventually began to bleed and was no longer pregnant.

Lyons testified that, over the course of several months, the women in the Baha'i church noticed a change in both Marous and her son. Her son appeared more withdrawn and would sit with his mother at church gatherings instead of playing with the other children. During church gatherings, Marous cried frequently during prayer time and one church member thought she appeared to be losing her hair, especially at the crown of her head.

Her son spent several hours in front of the computer webcam with Marous's sister, Ahdieh, who lived in Italy. Ahdieh testified her nephew did not want her to leave her computer, so she kept it on, even when she slept, so her nephew would have someone in his presence.

Marous testified that, one night after [Shakouri] raped her, she was in pain and called Akram Gheisar, a church member who spoke Farsi. She asked Gheisar to speak to the church's Assembly on her behalf. Gheisar told Lyons, who chaired the Assembly, that [Shakouri] was abusing Marous. The Assembly wrote a letter to Marous in Farsi, advising her that, for her own safety and that of her son, she should go to a women's shelter in Plano. Lyons explained Marous was too afraid to have the letter in her possession, so Gheisar kept the letter until several weeks later.

Around that time, Ahdieh came for a visit at her nephew's insistence. Ahdieh took the entire family on a trip to California and Las Vegas. Near the end of the trip, while [Shakouri] was taking a shower in the adjoining hotel room, Marous told Ahdieh that [Shakouri] was beating her and that she was losing her hair because [Shakouri] was pulling it out. Marous showed her sister

black marks on her wrists and ankles, which Ahdieh, a medical doctor, thought resembled marks left behind by handcuffs.

Marous testified she suspected [Shakouri] knew of her disclosure to her sister, because, on their trip home, he called her on her cell phone (even though she was in his line of sight) and threatened to rape and kill her. Ahdieh heard [Shakouri] tell Marous, "I will rape you as soon as your sister will go back to Italy in a way that you will not be able to sit up." Marous testified that, when they returned home, [Shakouri] called his brother and told him he would kill Marous, her son, and Ahdieh.

Frightened by what she overheard, Marous went into the room her sister was staying in and the two women hid in the closet. Her son testified he overheard [Shakouri] say, "I'm going to set them on fire; I'm going to kill them."

The next morning, after [Shakouri] left for work, Marous and Ahdieh spoke with some of the Baha'i church members, who read Marous the letter they had prepared, recommending a particular women's shelter that had a counselor who spoke Farsi.

That same morning, Marous, her son and Ahdieh gathered their things and were loading them into the cars of church members when [Shakouri] arrived. To keep the peace, church members called the Prosper police. Officer Baxter testified that, when he arrived, Marous and her son were scared and Ahdieh started translating what Marous was saying. At that point, Baxter heard information suggesting a crime had occurred, specifically, [Shakouri]'s threat to kill Marous, her son and Ahdieh. The police investigation began.

After Marous moved into a shelter, she met again with Officer Baxter and told him about the sexual abuse through the Farsi-speaking counselor at the shelter. Officer Baxter took photographs of the marks on Marous's ankles that corroborated her statements about the abuse. He applied for an arrest warrant for [Shakouri] and a search warrant for his home.

When officers executed the search warrant, they found a bag in the closet of the master bedroom that held various sex toys: (1)

dildos; (2) a penis sheath; (3) a fake vagina; (4) a penis pump; (5) vibrators; and (6) a nylon restraining device. Officers also seized a laptop computer, along with a few flash drives.

FBI computer forensic expert Jesse Basham testified he reviewed the flash drives and found more than 150 pornographic movies, mostly involving anal sex and bondage. At trial, a copy of all the electronic files Basham reviewed was admitted. Still shots from the movies were also admitted over [Shakouri]'s objection.

At trial, [Shakouri] called a medical doctor who had reviewed Marous's medical records and explained that her records did not reflect the kind of trauma to the anal cavity he would expect to see if someone had forced a large dildo into her anal cavity without lubricant or on a regular basis. [Shakouri] also called an immigration attorney, who explained that a non-citizen spouse could gain legal status in the United States through a claim that her citizen-spouse was abusing her.

[Shakouri] also testified on his own behalf and claimed that it was Marous, not he, who had the huge sexual appetite. He alleged the sex toys were hers and she brought them with her from Iran. He claimed to have never used the objects, though he admitted to watching an anal sex pornographic movie that he claimed Marous had sent him. He also contended it was Marous who downloaded the pornographic movies of women in dog chains and women being anally raped.

Although Marous had moved out by the time the police executed the search warrant and found the flash drives, [Shakouri] testified it was possible that Marous or her son could have planted the drive in his computer bag. Officer Baxter, however, testified Marous's house key no longer worked by the time the police executed the search warrant.

*Shakouri v. State*, 2010 WL 3386598, at *1–3.

## EXHAUSTION/LIMITATIONS/SUCCESSIVE PETITION

Because Shakouri has no state remedy remaining, Davis, here called "the Director," does not move to dismiss the petition for failure to exhaust. It does not appear that the petition is barred by limitation, 28 U.S.C. § 2244(d) (Westlaw 2016), or subject to the successive petition bar, 28 U.S.C. § 2244(b).

## STANDARD OF REVIEW

A federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d); *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Williams*, 529 U.S. at 405–06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the

"unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. To determine whether the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 101. Indeed, under § 2254(d)(1), this question is the only one that matters. *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is merited only where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA,[4] § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id.* (internal citations omitted; footnote added).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and not every jot of its reasoning. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (". . . we review only the state court's decision, not its reasoning or written opinion . . . ."). And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Richter*, 562 U.S. at 98; *Early v. Packer*, 537 U.S. 3, 8 (2002).

---

4 Anti-Terrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214 (1996).

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *Williams*, 529 U.S. at 381.

And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand . . ." because such a process suggests the proposed rule is not clearly established. *Alvarado*, 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence." § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

## ANSWER

## I.  Shakouri Does Not Show He Received Ineffective Assistance Of Counsel.

Shakouri raises several claims alleging that he received ineffective assistance of counsel.

A defendant who wishes to demonstrate ineffective assistance of counsel must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish deficient performance, a person must show that counsel's representation fell below an objective standard of reasonableness. *Richter*, 562 U.S. at 104 (citing *Strickland*, 466 U.S. at 688). A reviewing court must apply a strong presumption that counsel's representation fell within the wide range of reasonable professional assistance. *Id.* The defendant must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 690. The challenger must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.*

As for prejudice, a challenger must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have differed. *Id.* A reasonable probability is one sufficient to undermine confidence in the outcome. *Id.* It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 787–88.

Surmounting *Strickland*'s high bar is not easy. *Richter*, 562 U.S. at 105 (quoting *Padilla v. Kentucky*, 130 S. Ct. 1473, 1485 (2010)). The *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 689–90). Even under de novo review, the standard for judging counsel's representation is most deferential. *Id.* Unlike a later reviewing court, the attorney saw the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. *Id.* It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* (quoting *Strickland*, 466 U.S. at 689); *see also Bell v. Cone*, 535 U.S. 685, 702 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. *Richter*, 562 U.S. at 105. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *Richter*, 562 U.S. at 105, and when applied in tandem, review is "doubly" so. *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 255–56 (2009)).

Because the *Strickland* standard is general, the range of reasonable applications is substantial. *Richter*, 562 U.S. at 105. Federal habeas courts must not equate unreasonableness under *Strickland* with unreasonableness under § 2254(d). *Richter*, 562 U.S. at 105. When § 2254(d) applies, the question is not whether counsel's actions were reasonable. *Richter*, 562 U.S. at 105. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Richter*, 562 U.S. at 105.

The reviewing court under *Strickland* must grant deference to the decisions of trial counsel. *See Richter*, 562 U.S. at 101. Under § 2254(d), the reviewing court must grant deference not only to the decisions of counsel but must grant additional deference to the decision of the state court. *See Richter*, 562 U.S. at 101. The state court must be granted a deference and latitude that do not apply in a bare *Strickland* review. *See Richter*, 562 U.S. at 101.

Claims of ineffective assistance of counsel involve mixed questions of law and fact and are governed by § 2254(d)(1). *Gregory v. Thaler*, 601 F.3d 347, 351 (5th Cir. 2010).

## A.     Counsel's decision not to file a suppression motion was reasonable.

Shakouri alleges he received ineffective assistance when trial counsel failed to file a motion to suppress certain evidence arising from the seizure without probable cause of a computer and flash drives. (ECF No. at 6.)

Police executed a search warrant for Shakouri's house in Prosper, Texas, a Dallas suburb. (RR XI, pt. 7,[5] SX 1.[6]) The warrant alleged that Shakouri had bound the victim, identified at trial as his wife, Marous, and had raped her both vaginally and anally. (SX 2.) The affidavit alleged that victim had been sodomized with various foreign objects. (*Id.*) The victim said that Shakouri had threatened her with bodily harm and had threatened to send to the victim's son an email with "uncensored pictures" of the victim. (*Id.*) The victim said that Shakouri had taken photographs of her during and after the assaults. (*Id.* at 3.) The warrant authorized police to seize various "sex toys/dildos" and restraints; various computer equipment; the electronic contents of external and internal computer drives; and cameras and video equipment, and developed and undeveloped film. (*Id.* at 1–2.)

On the computer storage units were pornographic images and films, which were introduced at trial along with various dildos and sex toys, restraints, and emails. (RR XI, pts. 8–9, SXs 8–32.)

When Shakouri raised this claim on appeal, *Shakouri v. State*, No. 05-09-00158-CR (Tex. App.—Dallas Sept. 28, 2009) (Appellant's Am. Br. at 43),

---

[5] "RR" refers to the reporter's record of the trial testimony followed by the volume number in a Roman numeral, followed by the Part number and where needed the page numbers, both of the latter in Arabic.

[6] "SX" refers to the numbered exhibits offered and admitted into evidence at trial by the State.

the court determined that the record was not sufficiently developed to allow it to review the claim. *Shakouri v. State*, 2010 WL 3386598, at *6. The court said that Shakouri was required to prove there was no possible strategic reasons for counsel's actions. *Id.* It said that counsel should be given the opportunity to explain his actions before being denounced as ineffective. *Id.* Because the record before the court was devoid of evidence from counsel himself, the record was undeveloped and could not reflect adequately the failings of trial counsel. *Id.* Therefore, the court said, Shakouri failed to rebut the presumption counsel's decisions were reasonable. *Id.*

### 1. Trial counsel affidavit.

When Shakouri raised the issue again in state habeas proceedings (SHCR, pt. 1 at 10, 30–34),[7] the convicting court, sitting as habeas court, took evidence in the form of an affidavit from trial counsel, Bill Burdock (SHCR, pt.1 at 139–43).

Burdock said that he had previously represented Shakouri in a family violence case and a divorce case in Tarrant County and at the time of the criminal trial was representing Shakouri in a second divorce case and a civil matter in Collin County. (*Id.* at 139)

---

[7] "SHCR" refers to the Clerk's Record of pleadings and documents filed with the state habeas court followed by the part number and the page numbers.

Burdock said that Shakouri maintained that the entire affair arose from a conspiracy between his second wife, Marous, the victim, and an Iranian dentist in California "to achieve some vaguely defined goal." (*Id.*) Burdock said he told Shakouri that in Burdock's experience such situations arise where both parties originally consent to the behavior at issue but where one party withdraws consent that the other party wishes to continue the practice. (*Id.*) Burdock said that Shakouri rejected this approach and insisted in going to trial with a conspiracy theory. (*Id.*)

Burdock said that an additional concern involved keeping Shakouri off the stand. (*Id.*) Burdock said that Shakouri had testified a number of times in his divorce case and in each occasion had come off as a "nasty, abrasive, overbearing and insensitive individual who had little or no respect for women." (*Id.* at 139–40.) Burdock said that Shakouri rejected an approach that would keep him off the witness stand. (*Id.* at 140.)

Burdock said that in his opinion, the State had overplayed its hand, that the Marous's story "grew like topsy" and over time became increasingly outlandish. (*Id.*) Burdock said, "Mr. Shakouri agreed that if we could make the story sound so wild and fanatic [sic: fantastic?] no one would believe the story, and we could poke holes in various places to raise reasonable doubt. This strategy had worked for me in the past." (*Id.*)

Burdock acknowledged that he did not file a suppression motion. (*Id.*) He said that Shakouri's position was that the evidence at issue was planted by Marous, Marous's son, or the police. (*Id.*) Burdock said that some of the "worst images" were, by agreement with the State, kept from the jurors. (*Id.*)

Burdock said that he "seriously doubted" that the judge would have granted a suppression motion. (*Id.*) He said that the victim, Marous, also lived in the target house, although at one time she was staying in a women's shelter. (*Id.*) He said that she had told police about the computer and its contents. (*Id.*)

Burdock said also that evidence at issue helped advance the defense strategy of showing that Marous's claims were outlandish. (*Id.*) He said that the defense introduced testimony from a number of "well dressed, sophisticated, professional people" who knew Shakouri and who told jurors that he never did anything professionally or socially that would indicate he was "incline[d] to pornography" or the "abuse of women." (*Id.*) Burdock introduced testimony from Shakouri's former wife who told jurors that during their long marriage she never saw pornography in his possession and that she never engaged in deviant behavior with him. (*Id.*)

Burdock said that the defense also produced a video-tape deposition in which a neighbor of Marous in Tehran, Iran, said that before her marriage to Shakouri, Marous possessed a dildo of the same description as the one seized in the search. (*Id.*)

### 2. State court adjudication.

In its findings and conclusions, the convicting court determined that Shakouri cited no fact-specific authority supporting his claim that the warrant affidavit did not contain sufficient facts to allow a finding of probable cause to search the computer and flash drive. (SHCR, pt. 2 at 257, para. 13.) The court determined that Shakouri had adduced no evidence that trial counsel's strategic decision to forgo a challenge to the warrant and to prove that Shakouri did not commit the acts alleged was unreasonable. (*Id.*, para. 14.) The court said that Shakouri had failed to prove that counsel's actions were not sound strategy based upon reasonable investigation, that the performance of counsel was deficient, or that he was prejudiced by counsel's representation. (*Id.* at 262, paras. 41–42.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

### 3. Analysis.

Failure to raise meritless objections is not ineffective lawyering; it is the very opposite. *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994).

Counsel would have made his decision about whether to file a suppression motion relying in part of the state and federal law regarding probable cause affidavit supporting the search warrant. Both the federal and the Texas Constitutions dictate that no search warrants may be issued without

probable cause. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9; *see also* Tex. Code Crim. Proc. art. 18.01(b) (Westlaw 2016)(providing that "[n]o search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance"). When determining whether probable cause exists to issue a search warrant, courts should be mindful of the proposition that there is a "strong preference for searches conducted pursuant to a warrant" over searches conducted without a warrant. *Illinois v. Gates*, 462 U.S. 213, 236 (1983); *see United States v. Ventresca*, 380 U.S. 102, 106–07 (1965) (noting that fact that there are so few exceptions to warrant requirement "underscores the preference accorded police action taken under a warrant as against searches and seizures without one"). Because of the preference to be given search warrants, a search incident to a warrant may be upheld in doubtful or marginal cases in which a search without a warrant would be unsustainable. *Ventresca*, 380 U.S. at 106; *see Massachusetts v. Upton*, 466 U.S. 727, 734 (1984) (recognizing that it may not be easy to determine if probable cause is present in particular case but emphasizing that resolution of inquiry should be made in light of preference given to warrants).

When determining whether probable cause exists, courts should consider the totality of the circumstances. *Gates*, 462 U.S. at 238; *see Upton*, 466 U.S. at 728 (explaining that magistrates should not employ fixed and rigid formulas

when determining if probable cause is present). Magistrates should rely only on the facts "found within the four corners of the affidavit" accompanying the request for a warrant, *State v. Bradley*, 966 S.W.2d 871, 873 (Tex. App.—Austin 1998, no pet.); *see also* Tex. Code Crim. Proc. art. 18.01(b) (Westlaw 2016) (requiring applicants for search warrant to file "sworn affidavit setting forth substantial facts establishing probable cause"), and should review the affidavit in a common sense, rather than a hypertechnical, manner, *Rodriguez v. State*, 232 S.W.3d 55, 59 (Tex. Crim. App. 2007); *see Ventresca*, 380 U.S. at 108–09. As part of their probable-cause assessment, magistrates are permitted to make reasonable inferences from the information in the affidavit. *Rodriguez*, 232 S.W.3d at 61. Ultimately, the magistrate must determine whether "given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238; *see United States v. Grubbs*, 547 U.S. 90, 95 (2006).

To be proper, the affidavit must provide enough information to allow a magistrate to determine if probable cause exists and to ensure that the magistrate's determination is not "a mere ratification of the bare conclusions of others." *Gates*, 462 U.S. at 239; *see Franks v. Delaware*, 438 U.S. 154, 165 (1978) (explaining that affidavit "must set forth particular facts and

circumstances underlying the existence of probable cause" that allow "magistrate to make an independent evaluation of the matter").

There must be a nexus between the items sought to be seized and the alleged criminal behavior. *See Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967). That nexus is automatically established when the items sought are contraband or the fruits obtained from or the instruments used in the criminal activity at issue. *Id.*

Shakouri fails to show that had counsel filed a suppression motion based on the lack of probable cause supporting the warrant, the motion would have succeeded. Counsel was not required to pursue a futile course. *See Clark*, 19 F.3d at 966. Marous was or had been an occupant of the house and knew of the sex toys, dildos, restraints, and computer equipment. She alleged that the sexual assaults had been committed with the foreign objects at issue and that threats had been made through emails. Counsel's judgment that a suppression motion would not have succeeded was reasonable. *See Richter*, 562 U.S. at 104. The state court decision reflected a reasonable application of *Strickland* and *Richter. See* § 2254(d)(1).

## B.  Counsel's decision not to object to evidence was strategic.

Shakouri alleges that he received ineffective assistance when counsel failed to object on state law grounds to the admission into evidence certain pornographic images and films. (ECF No. 1 at 6.) He alleges that counsel

should have raised an objection on grounds that the admission of the evidence violated Texas Rule of Evidence 404(b), which states that evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. (ECF No. 1-1 at 4–5.)

When Shakouri raised the issue on appeal, *Shakouri v. State*, No. 05-09-00158-CR (Appellant's Am. Br. at 43–44), the court determined that because he offered no evidence of counsel's reasoning, Shakouri failed to rebut the presumption of sound trial strategy. *Shakouri v. State*, 2010 WL 3386598, at *6.

In state habeas proceedings, trial counsel testified through an affidavit. He said that he thought the pictures were not relevant to any issue being tried but that the images supported the defense strategy of proving that Marous's allegations were outlandish and not credible. (SHCR, pt. 1 at 140–41.) Counsel said that nothing connected the pictures to Shakouri but proximity to his property. (*Id.* at 141.)

The convicting court determined that Shakouri alleged at trial and in state habeas proceeding that Marous was the sexual aggressor and owned the sexual devices used in the assaults. (SHCR, pt. 2 at 258, para. 16.) The court determined that the sexual images corroborated the victim's account and showed that Shakouri, rather than Marous, owned the items in question. (*Id.*,

para. 17.) The court found that Shakouri had adduced no evidence to show that counsel's decisions regarding the evidence were unreasonable. (*Id.*, para. 19.) The court determined that Shakouri failed to carry his burden of showing he received ineffective assistance of counsel. (*Id.* at 262, paras. 41–43.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

First, the state habeas court determined that the evidence was relevant because it corroborated Marous's account and show that Shakouri, rather than Marous, owned the items in question. (SHCR pt. 2 at 258, para. 17.) The evidence was relevant to a trial issue, that is, the evidence tended to prove the prosecution's rather than Shakouri's version of events. Because the evidence was admissible on grounds other than showing Shakouri's character and showing that on a particular occasion he acted in accordance with that character, an objection on Rule 404(b) grounds would not have succeeded. And because an objection likely would have been futile, counsel was not ineffective for forgoing an objection. *See Clark*, 19 F.3d at 966. The decision of the state court reflected a reasonable application of *Strickland* and *Richter*. *See* § 2254(d)(1).

## C.     Counsel's forgoing an election was reasonable.

Shakouri alleges he received ineffective assistance when counsel failed to require the State to make an election as to the specific offense upon which it would rely for conviction. (ECF No. 1 at 6.)

When Shakouri raised the issue on appeal, *Shakouri v. State*, No. 05-09-00158-CR (Appellant's Am. Br. at 44–45), the court determined that because he offered no evidence of counsel's reasoning, Shakouri failed to rebut the presumption of sound trial strategy. *Shakouri v. State*, 2010 WL 3386598, at *6.

In state habeas proceedings, trial counsel testified that forgoing an election worked to Shakouri's advantage. (SHCR, pt. 1 at 142.) Had counsel forced the State to elect, evidence of other sexual assaults likely would have gotten before the jurors by other means. (*Id.*) And, counsel said, the defense strategy was based on Marous's story being too exaggerated and embellished to be believable. (*Id.*)

The convicting court determined that whether to force a State election is a matter of trial strategy. (SHCR, pt. 2 at 259, para. 21.) The court determined that Shakouri had failed to carry his burden of showing ineffective assistance. (*Id.* at 262, paras. 41–43.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

A defendant's decision to elect is purely strategic. *Cosio v. State*, 353 S.W.3d 766, 775 (Tex. Crim. App. 2011); *Mayo v. State*, 17 S.W.3d 291, 298 (Tex. App.—Fort Worth 2000, pet. ref'd) ("[B]ecause the decision to exercise the right to request an election is a matter of trial strategy, we must assume that counsel chose not to request an election as a result of reasonable professional judgment.") (citing *Strickland*, 466 U.S. at 690). Where a defendant forgoes an election, the State is barred by double jeopardy from prosecuting any of the offenses in evidence. *Cosio*, 353 S.W.3d at 775. On the other hand, forcing an election may prevent the State from offering evidence of extraneous offenses, may to minimize the risk that the jurors might convict, not because one or more crimes were proved beyond a reasonable doubt, but because all of them together convinced the jurors the defendant was guilty; may ensure a unanimous verdict, may give the defendant notice of the particular offense upon which the State intends to rely. *Phillips v. State*, 193 S.W.3d 904, 909–10 (Tex. Crim. App. 2006).

The evidence before the state habeas court does not rebut the presumption that counsel's decision to forgo an election was based upon sound trial strategy. *See Strickland*, 466 U.S. at 690 Counsel calculated that even had he forced an election, other offenses nonetheless would have been admitted. (SHCR pt. 1 at 142.) Further, forgoing an election fell in line with defense strategy to attempting to prove that Marous's version of events was

too fantastic to believe. (*Id.*) Shakouri does not show that the state court's adjudication reflected an unreasonable application of *Strickland* or *Richter*. *See* § 2254(d)(1).

### D. Shakouri wanted an all-or-nothing defense.

Shakouri alleges that he received ineffective assistance when counsel failed to request an instruction on the lesser included offense of sexual assault. (ECF No. 1 at 6.) When Shakouri raised the issue on appeal, *Shakouri v. State*, No. 05-09-00158-CR (Appellant's Am. Br. at 44–45), the court determined that because he offered no evidence of counsel's reasoning, Shakouri failed to rebut the presumption of sound trial strategy. *Shakouri v. State*, 2010 WL 3386598, at *6.

In state habeas proceedings, however, the trial counsel testified that Shakouri would not agree to a strategy that acknowledged a lesser form of culpability. (SHCR, pt. 1 at 142.) Counsel suggested to Shakouri that the conduct may at one time have been consensual but that later Marous withdrew her consent. (*Id.* at 139.) Burdock said that Shakouri rejected that approach because his religion rejected the behavior alleged by the State. (*Id.* at 139.) Thus, rather than merely denying that he threatened to kill Marous, Shakouri denied he sexually assaulted her at all. (*Id.* at 142.) Counsel said this approach did not raise the lesser-included offense of sexual assault. (*Id.* at 142.)

The convicting court determined that Shakouri's denial that any sexual assault occurred did not raise the lesser-included offense of sexual assault. (SHCR, pt. 2 at 260, para. 27.) Shakouri "dictated an all or nothing defense." (*Id.*, para. 28.) Shakouri offered no evidence or cite specific authority that counsel's strategic decision was unreasonable or that no reasonable attorney would have made the same decision. (*Id.*, para. 29.) The court determined that Shakouri has failed to carry his burden of showing that he received ineffective assistance of counsel. (*Id.* at 262, paras. 41–43.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

Texas jurisprudence has a two-step test to determine whether a lesser included offense instruction should be given: First, the lesser included offense must be within the proof necessary to establish the offense charged; second, there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser offense. *Richards v. Quarterman*, 566 F.3d 553, 568–69 (5th Cir. 2009). As noted by trial counsel, Shakouri denied not only the threats but the sexual assault also. (SHCR pt. 1 at 142.) Hence, there was no evidence that Shakouri, if he was guilty of anything, was guilty of the sexual assault only. *See Richards*, 566 F.3d at 568–69. Shakouri was not entitled to a lesser-included offense charge. *See id.* Any counsel request would have been futile. *See Clark*, 19 F.3d at 966; *see also Wilson v. Cockrell*, 70 F. App'x 219,

228 (5th Cir. 2003) (unpublished) (determining that lesser-included offense instruction would have been inconsistent with defense strategy).

Further, even were a lesser-included offense charge available, counsel can reasonably forgo such a request. Counsel may wish to avoid a compromise verdict, a verdict in which the jurors could not find the defendant of the charged offense but would settle on the lesser offense, were the instruction available. Counsel, if he thinks the State cannot prove the greater offense, may reasonably wish to go for an acquittal. *See Anderson v. Collins*, 18 F.3d 1208, 1219 (5th Cir. 1994) (finding counsel's decision to forgo lesser-included offense instruction "was a conscious decision based on trial strategy"). Shakouri offers no evidence to rebut the presumption that counsel's decision arose from anything other than sound trial strategy and does not show that the state court's adjudication reflected an unreasonable application of *Strickland* or *Richter. See* § 2254(d)(1).

### E. Counsel wanted no limiting instruction.

Marous testified at trial that she told her sister of Shakouri's actions. When her husband discovered that she had spoken to her sister, he threatened to kill Marous. (RR IV, pt. 6: 194.) Shakouri alleges he received ineffective assistance when trial counsel failed to seek a limiting instruction regarding evidence that on November 28, 2006, Shakouri threatened to kill Marous. (ECF No. 1 at 7.)

When Shakouri raised the issue on appeal, *Shakouri v. State*, No. 05-09-00158-CR (Appellant's Am. Br. at 46–47), the court determined that because he offered no evidence of counsel's reasoning, Shakouri failed to rebut the presumption of sound trial strategy. *Shakouri v. State*, 2010 WL 3386598, at *6.

In state habeas proceedings, trial counsel testified through an affidavit that because Marous during the marriage did not act like an abused women, counsel did not want a limiting instruction. (SHCR, pt. 1 at 141.) Counsel thought a limiting instruction would draw attention to the testimony. (*Id.*) The defense decided to use the allegation as further proof that Marous embellished her story. (*Id.*) Counsel said the threat allegation was "wild" and was "elicited at the same time [Marous] testified of hair pulling." (*Id.* at 142.) "We countered this statement," counsel said, "by showing the jury many family photos, none of which reflected any loss of [Marous's] hair and all of which reflected the witness enjoying the opportunity to visit her in laws." (*Id.*)

The convicting court determined that Shakouri had adduced no evidence that counsel's strategic decision regarding the limiting instruction was unreasonable or that no reasonable attorney would have made the same choice. (SHCR, pt. 2 at 260, para. 33.) The court determined that Shakouri had failed to carry his burden of showing that he received ineffective assistance of counsel. (*Id.* at 262, paras. 41–42.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

Forgoing a limiting instruction regarding certain evidence can fall within the ambit of reasonable professional assistance. *See Mosley v. Quarterman*, 306 F. App'x 40, 2008 WL 5381299, at *7 (5th Cir. 2008) (unpublished) (determining that trial counsel's performance in failing to obtain a limiting jury instruction when counsel admitted entirety of prosecution expert's investigation into evidence, without limiting the use of such evidence to cross-examination purposes, was reasonable trial strategy); *Kessler v. Dretke*, 137 F. App'x 710, 711 (5th Cir. 2005) (unpublished) (determining that state court did not unreasonably apply clearly established federal law on ineffective assistance of counsel in determining that counsel was not in making strategic decision not to repeatedly object to extraneous evidence of family's corrupt lifestyle or to call additional attention to evidence by seeking limiting instructions); *Vasquez v. Thaler*, No. SA-09-CA-930-XR, 2012 WL 2979035, at *41 (W.D. Tex. July 19, 2012) (unpublished) ("The decision by petitioner's defense team not to seek a limiting jury instruction regarding evidence of petitioner's Mexican Mafia membership did not cause the performance of said counsel to fall below an objective level of reasonableness."); *Delgado v. State*, 235 S.W.3d 244, 250 (Tex. Crim. App. 2007) ("... Texas courts have frequently stated that the decision of whether to request a limiting instruction concerning

the proper use of certain evidence, including extraneous offenses, may be a matter of trial strategy.")

Counsel though a limiting instruction would have drawn attention to the testimony. Additionally, a request for a limiting instruction would have suggested that he threat actually occurred, an action Shakouri denied. Shakouri offers nothing to suggest that counsel's decision to forgo a limiting instruction arose from other than sound trial strategy, *see Strickland*, 466 U.S. at 690, and he does not show that the state court unreasonably applied relevant Supreme Court precedent set out in *Strickland* and *Richter*. *See* § 2254(d)(1).

### F. Counsel's decision to forgo voir dire objections was strategic.

Shakouri alleges he received ineffective assistance when trial counsel failed to object to improper voir dire by the prosecutor. (ECF No. 1 at 7.) Shakouri alleges that the improper voir dire allowed the prosecutor to place before the jurors "unsworn and unqualified opinions regarding the effects of long-term abuse, battered women's syndrome, and forensic testing." (*Id.*)

Shakouri complains that during voir dire the prosecutor asked a panel member who had been a volunteer with a family services agency whether she had seen "these type of cases of long-term abuse of domestic violence?" (RR II, pt. 2: 36).

The prosecutor also questioned another panel member about a friend in a "long term" abusive relationship. (RR II, pt. 2: 37–40.) Shakouri argues that the questioning put before other potential jurors the opinions of the panel member regarding an abuse victim's reluctance to leave an abusive relationship. (ECF No. 1-1 at 13.)

The prosecutor questioned a panel member who was a nurse about the types of rape examinations and evidentiary significance of the length of time between the offense and the exam. (RR II, pt. 2: 41–44.)

When Shakouri raised the issue on appeal, *Shakouri v. State*, No. 05-09-00158-CR (Appellant's Am. Br. at 47–48), the court determined that because he offered no evidence of counsel's reasoning, Shakouri failed to rebut the presumption of sound trial strategy. *Shakouri v. State*, 2010 WL 3386598, at *6.

In state habeas proceedings, trial counsel said, "It is true that I could object to many statements made by the Prosecutor. I made a number of objections, which were sustained by the Court. The prosecutor was a very personable young man who was liked by the jury." (SHCR, pt.1 at 143.)

Counsel said that the prosecutor's statements to the panel members did not hurt the defense's case as much as Marous's testimony. (*Id.*)

Counsel said, "It is always my theory that you can often object too many times and the jury panel gets angry at you. Therefore unless the statements hurt us, I did not object." (*Id.*)

The convicting court determined that Shakouri cited no fact-specific authority showing that the prosecutor's voir dire questions were objectionable. (SHCR, pt. 2 at 261, para. 39.) The court also found that Shakouri had adduced no evidence showing the counsel's strategic decision to forgo objections was unreasonable. (*Id.*, para. 40.) The court determined that Shakouri had failed to carry his burden of showing he received ineffective assistance of counsel. (*Id.* at 262, paras. 41–43.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

The manner of conducted voir dire and whether to object to a prosecutor's actions is matter of trial strategy. S*ee, e.g., Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (determining that counsel failure to ask questions during voir dire may have been part of legitimate strategy); *Hines v. State*, 144 S.W.3d 90, 99 (Tex. App.—Fort Worth 2004, no pet.) (noting that counsel's manner of conducting voir dire may be grounded in sound trial strategy); *Richards v. State*, 912 S.W.2d 374, 381 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) (determining that defense counsel's forgoing an objection

to prosecutor's statement regarding a body may have been part of defense strategy to downplay the issue of violence).

Trial counsel said he decided to forgo objections so as not to alienate the jurors. (SHCR, pt. 1: 143.) And he did not consider the prosecutor's questions problematic. (*Id.*) Shakouri does not show that counsel's decisions regarding voir dire arose other than from sound trial strategy. *See Strickland*, 466 U.S. at 690. The adjudication of the state court reflected a reasonable application of Supreme Court precedent set out in *Strickland* and *Richter*. *See* § 2254(d)(1).

## II. As For Shakouri's Allegation That The Police Or Complainant Planted Evidence, The State Court's Factual Determination Was Reasonable.

Shakouri alleges he was deprived of due process because the State or the complainant planted that evidence recovered during the execution of the search warrant. (ECF No. 1 at 6.) The Director construes the claim as an allegation that the State knowingly offered perjured testimony.

Due process protections to require a new trial when convictions are obtained through material evidence known to be false by representatives of the State. *Giglio v. United States*, 405 U.S. 150, 153–54 (1972); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). This is true regardless of whether the State solicits false testimony or merely allows testimony which it knows to be false to go uncorrected. *Giglio*, 405 U.S. at 153; *Napue*, 360 U.S. at 269. A prosecutor's

knowing use of perjured testimony violates the Due Process Clause. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935).

When Shakouri presented this claim in state habeas proceedings, he supported the claim with signed unsworn statements[8] from David Lightfoot Hernandez (SHCR, pt. 1 at 77) and Walter Bruce Cornet (*id.* at 84), both inmates at the James A. Lynaugh Unit of the Texas Department of Criminal Justice-Correctional Institutions Division, and an affidavit made by Mohammad R. Monteghinezhad (*id.* at 121).

### A.    Petitioner's evidence.

#### 1.    Hernandez statement.

In his statement, Hernandez said that he heard another inmate, identified as Offender Hutchinson, talking to Shakouri. (*Id.* 77.) Hernandez said that Hutchinson told Shakouri the following story:

Hutchinson, was a confidential informer for the Collin County District Attorney's office and for the FBI. (*Id.* at 78.) He knew Deanna DeYoung,[9] that

---

[8] Although Lightfoot's statement is styled an "affidavit," (SHCR, pt. 1 at 77) neither inmate statement is sworn and neither is made "under penalty of perjury" as required by statute for unsworn declarations. *See* Tex. Civ. Prac. & Rem. Code § 132.001 (Westlaw 2016).

[9] DeYoung was a member of Marous's Baha'i congregation and helped Marous move into a women's shelter. (SHCR, pt. 1 at 180–81, paras. 3–5.) And although in her affidavit she is identified as "Deanna Tabb," for the sake of consistency this pleading will use the surname "DeYoung" throughout.

Marous had lived with DeYoung for two months, and that Marous[10] had cut the hair of Hutchinson's son. (*Id.* at 77.)

Hutchinson seemed to suggest that he gathered information about Shakouri's case while working as an informer for the Collin County DA. (*Id.* at 78.)

Hutchinson said that Marous had asked him to hack into Shakouri's computer and place child pornography on the hard drives. (*Id.* at 78.)

Hutchinson said that Marous and Dr. Reza, the California dentist, had been having a long-term affair that had begun in Iran. (*Id.* at 78.) Hutchinson said that Dr. Reza took Marous and a "high-dollar call-girl" to the Anatole Hotel where Dr. Reza had the presidential suite. (*Id.* at 78.) Hutchinson said that one of Marous's fantasies was having sex with another female in a luxury hotel. (*Id.* at 78.)

Hutchinson told Shakouri that Dr. Reza made Marous file charges against her husband. (*Id.* at 78.) Hutchinson said that Marous did not want Shakouri to go to prison but only wanted money from him. (*Id.* at 78.) But Dr. Reza, DeYoung, and the Collin County DA did not allow Marous to drop the charges. (*Id.* at 78–79.)

---

[10] In Iran, Marous worked as a hair-dresser. (RR IV pt. 4 at 146.)

Hutchinson said that Marous asked DeYoung and him to help her break up with Dr. Reza after Dr. Reza failed to extort money from Shakouri. (*Id.* at 79.)

Marous told Hutchinson, he said, that Marous never wanted to live with Shakouri but used him to immigrate to the United States so she could continue her affair with Dr. Reza. (*Id.* at 79.)

Hutchinson said that in early December 2007, he, DeYoung, and Marous reached an agreement to place evidence, that is, sex toys, rope, and a flash drive, in Shakouri's house in Prosper. (*Id.* at 79.) Hutchinson told Shakouri that the evidence was placed in the house with the knowledge of the Collin County DA. (*Id.* at 79.)

Hutchinson told Shakouri that the evidence had been placed in the house by a "rogue detective" working with the district attorney. (*Id.* at 80.) Hutchinson declined to name the detective. (*Id.* at 80.)

Hutchinson told Shakouri that while Marous was living with DeYoung she slept with many men, including a Persian man named Fahemi who owned a tanning salon and was a cocaine dealer. (*Id.* at 80.)

Hutchinson said it was even possible that Marous slept with the prosecutor in Shakouri's case, Curtis Howard. (*Id.* at 80,)

Hutchinson that that Marous became acquainted with a porn star who lived near DeYoung and that Marous performed in a pornographic movie shot

in the porn star's back yard in spring 2007 and that the film was posted on a lesbian web site. (*Id.* at 80.)

Hutchinson said that DeYoung was concerned that Marous would not be allowed into the women's shelter because she was a prostitute. (*Id.* at 81.)

### 2. Cornet statement.

Cornet submitted a statement in which he said that an individual identified only as "CH," presumably Curtis Howard, the prosecutor in Shakouri's case, was party to conversations between Marous and DeYoung. (SHCR, pt. 1 at 84.) He said that DeYoung told Marous to go to the "Condoms to Go" store and to purchase sex toys to plant in Shakouri's house. (*Id.*) Cornet said also that a handgun was to be planted in Shakouri's house "in order to extort money from him." (*Id.*) Cornet said that Marous was going to have Shakouri purchase a handgun and fire the gun at a firing range so that Shakouri would get gunfire residue his hands. (*Id.*) Marous then was going to accuse Shakouri of trying to kill her. (*Id.*)

### 3. Manteghinezhad affidavit.

In his notarized affidavit, Manteghinezhad said that he had met Marous some time before trial and that they had "engaged in especially intimate knowledge" before the during the trial. (*Id.* at 121.) He said that although he was not in the courtroom during the entire trial, he was a translator between Marous and Curtis Howard, the prosecutor. (*Id.* at 121.) Manteghinezhad said

that he knew, "without a doubt," that Marous fabricated information and evidence and that some facts to which she testified were misrepresented. (*Id.* at 121.)

He said that while "in the course of having intimate relations" with Marous, he knew that when Marous testified that she met the California dentist solely for the purpose of finding employment that testimony was a "lie." (*Id.* at 121.) Manteghinezhad said that he knew that Marous and the dentist had been having a relationship in Iran. (*Id.* at 121.)

He said that Marous told him that her son had placed the flash drive in Shakouri's laptop case. (*Id.* at 122.)

He said that Marous had a "profuse appetite for sex." (*Id.* at 122.)

He said that Marous told him that "prior to the FBI" coming to the house and collecting "all the dildoes," she had put the items in the closet so that they would be found easily by the agents. (*Id.* at 122.)

He said that Marous told him that she liked to be a "con artist," and that she and her sister had planned to con him out of tens of thousands of dollars. (*Id.* at 122.) He said he lent Marous $4,500. (*Id.* at 122.)

## B.     State's evidence.

In response, the State offered affidavits from Marous (SHCR pt. 1 at 175–77); DeYoung (*id.* at 180–83); Soheil Roshani, Marous's son (SHCR pt. 2 at 186); Christopher Fredericks, a Collin County assistant district attorney (*id.*

at 188–90); Curtis Howard, Shakouri's trial prosecutor (*id.* at 193–97); and Sam Owens, a detective with the Prosper Police Department (*id.* at 199).

### 1. Marous's affidavit.

In her affidavit, Marous said she did not know the individual identified as Gale Corbett Hutchinson,[11] did not recognize a picture of Hutchinson, had never cut the hair of Hutchinson's son, did not ask Hutchinson or anyone to hack into Shakouri's computer, did not tell Hutchinson or anyone that she filed charges against Shakouri to get money, did not ask Hutchinson or anyone to help her break up a relationship, never told Hutchinson or anyone that she had tried to drop charges against Shakouri, never told Hutchinson or anyone that she never wanted to live with Shakouri and was using Shakouri only to immigrate to the United States, and never discussed with anyone planting evidence at Shakouri's house. (SHCR, pt. 1 at 175–76, para. 5.)

Marous said that she knew DeYoung but was not in regular contact with her, that they were friends on social media, that she met DeYoung and DeYoung's husband, Brad, through the Baha'i community after she came to the United States, that DeYoung helped her "escape" from Shakouri's home, that DeYoung called the police to aid Marous in leaving Shakouri's house, that DeYoung helped her get into a women's shelter, that she had never lived in

---

[11] Hernandez's statement identified Hutchinson as "Offender Hutchinson."

DeYoung home, that she did not ask DeYoung or anyone to help her break up a relationship, that she never spoke to DeYoung or anyone about planting evidence in Shakouri's house, and that DeYoung never told her to go to the "Condoms to Go" store to buy sex toys to plant in Shakouri's house. (*Id.* at 176, para. 6.)

Marous said she had never had a sexual relationship with Curtis Howard, never had a sexual relationship with anyone named Fahemi, and had never been a prostitute. (*Id.*, para. 7.)

She said that the events described by Hutchinson could not have happened because at the time in question she did not speak English and DeYoung did not speak Farsi. (*Id.*, para. 8.)

She said she knew Manteghinezhad. (*Id.*, para. 8.) He was a close friend of an Iranian woman named Maryam, with whom Marous worked after getting her hair-dresser's license. (*Id.*) Manteghinezhad attended the trial occasionally and at times helped her communicate with the prosecutors but was not the court's translator. (*Id.*) She had never had "intimate or sexual relations" with Manteghinezhad, did not tell him that her son had placed a flash drive in Shakouri's laptop case, did not tell Manteghinezhad that she had put Shakouri's sex toys in a suitcase for FBI agents to find, never told Manteghinezhad about any relationships with other men, and never told him that she wanted to be a con artist. (*Id.*)

She said that one time after the trial while she was working at Maryam's salon, Manteghinezhad pushed her against the wall, tried to kiss her, and told her he wanted to marry her. (*Id.* at 177, para. 10.) She told him she did not like him. (*Id.*) He had never lent her $4,500. (*Id.*)

## 2. DeYoung's affidavit.

In her affidavit, DeYoung said she knew Shakouri and Marous through the local Baha'i congregation. (SHCR, pt. 1 at 180, paras. 3 & 4.) When DeYoung met Marous, DeYoung spoke no Farsi and Marous spoke no English. (*Id.*, para. 4.)

Tabb said that she helped Marous and Marous's son move from Shakouri's house to a women's shelter and called police to monitor the move. (*Id.* at 180–81, para. 5.) She said she and other congregation members helped Marous recover some personal items from Shakouri's house. (*Id.* at 181, para. 6.)

She said knew neither Hernandez nor Cornet. (*Id.*, para. 7.)

She recognized Hutchinson. (*Id.*, para. 8.) She said that he lived in her neighborhood, that she was friendly with his wife, that she may have spoken to him at neighborhood functions, and that he owned a pizza parlor. (*Id.*) She said that so far as she knew, Hutchinson never knew Marous. (*Id.*)

She said that Marous had never lived with her, that she never prevented Marous from dropping charges against Shakouri, that she had never heard of

Dr. Reza, that Marous never asked her to help her break off her relationship with Dr. Reza, and that she had never had a conversation with Marous in Hutchinson's presence. (*Id.*, paras. 9–11.)

She said she had never telephoned Hutchinson, that Hutchinson, Marous, and she had never hatched a plan to plant evidence at Shakouri's house, that she had never introduced Marous to a neighborhood porn actor or to anyone in the neighborhood, that she had no reason to believe that Marous was a prostitute, and that she never told Marous to buy sex toys at the "Condoms to Go" store. (*Id.* at 182–83, paras. 12–18.)

### 3. Roshani affidavit.

Roshani, Marous's son, in his affidavit said that his trial testimony was true and that he never placed a flash drive or any other item in Shakouri's computer bag. (SHCR, pt. 2 at 186, paras. 4 & 5.)

### 4. Fredericks affidavit.

Christopher Fredericks, a Collin County ADA, said from September 2008 to July 2009, he had investigated Hutchinson for multiple cases of identity theft and fraud. (SHCR, pt. 2 at 188–89, para. 3) Ultimately Hutchinson pleaded guilty to one count of securing execution of a document by deception over $200,000; one count of theft over $20,000 but less than $100,000.00; and three counts of false statement to obtain property or credit over $20,000 but less than $100,000. (*Id.* at 189, para. 3.) He said that Hutchinson was

sentenced to five years in prison on each count. (*Id.*) He said that Hutchinson also pleaded guilty to credit card abuse and false statement to obtain property or credit over $1,500 but less than $20,000. (*Id.*) He was sentenced to eighteen months in state jail. During the time of the pending investigation, Denton County was investigating Hutchinson for falsely holding himself out as a lawyer. (*Id.*) He said that in his opinion, Hutchinson was not credible. (*Id.* at 190, para. 5.)

### 5. Howard affidavit.

Curtis Howard, the trial prosecutor, said that because Marous—he called her Ms. Shakouri—spoke little English, they communicated through a translator or her son. (SHCR, pt. 2 at 193, para. 5.) He said that he had no knowledge of Corbett Hutchinson ever working as a confidential informer for the Collin County District Attorney's office. (*Id.* at 194, para. 7.)

As for allegations that a Dr. Reza made Marous file charges against Shakouri for financial gain, Howard said the case was brought to the attention of the Prosper Police Department through a telephone call from DeYoung, who sought assistance so that Marous and her son could safely leave the their home and move to a shelter. (*Id.*, para. 8.) Based on the call from DeYoung, the Prosper Police Department began an investigation that led to Shakouri's arrest. (*Id.*) Howard said Dr. Reza played no part in alerting authorities to the situation or initiating the investigation. (*Id.*) He said that at no time did

Marous asked him to drop the case and that she was throughout the pendency of the case cooperative. (*Id.*)

As for allegations that in DeYoung, Marous, and Hutchins agreeing in December 2007 to place evidence in Shakouri's house, Prosper police received the call from DeYoung seeking assistance for Marous on November 29, 2006. (*Id.* at 194–95, para. 9.) The search and arrest warrant was obtained on December 15, 2006, and was executed on December 18, 2006, when officers arrested Shakouri and seized the evidence. (*Id.* at 195, para. 9.)

As for the allegation that Marous participated in a pornographic movie of which the district attorney's office was aware and that Marous and Howard may have had an intimate relationship, Howard said was aware of no pornographic movie featuring Marous. (*Id.*, para. 10.) And, he said, he never had a non-professional relationship with Marous or any witness. (*Id.*)

Regarding the allegation of Manteghinezhad that he acted as a translator between Marous and Howard, Howard said he understood Manteghinezhad to be a friend of Marous's. (*Id.* at 11.) Manteghinezhad, Marous's son, and other members of the local Iranian community helped Howard communicate with Marous in preparing for trial. (*Id.*) Howard hired a certified translator from Houston for pretrial and trial proceedings. (*Id.*) He said that at no time during or after trial did Manteghinezhad tell Howard that any statement by Marous was misrepresented or miscommunicated. (*Id.*)

As for the flash drive found in Shakouri's laptop case, Howard said that Shakouri alleged at trial that the drive had been planted by Marous or her son. (*Id.* at 196, para. 12.) Howard said that there was never any indication that the material on the drive came from any source other than Shakouri. (*Id.*)

As for allegations that DeYoung told Marous to buy sex toys at the "Condoms to Go" store and to plant those items and a handgun at Shakouri's house, a least one sex toy found at the house bore Arabic style writing and presumably did not come from the "Condoms to Go" store. (*Id.*, para. 13.) Police found no handgun at Shakouri's house. (*Id.*)

While statements from Hernandez and Cornet alleged that Marous planted the sex toy evidence at Shakouri's house, Shakouri testified at trial that Marous had the items when he and Marous were together in Iran. (*Id.*, para. 14.)

###    6.    Owens affidavit.

Sam Owens, a detective with the Prosper Police Department, in an affidavit said that department records did not reflect that Hutchinson acted as an informer in the Shakouri case. (*Id.* at 199.)

###    C.    Findings and conclusions.

After recounting the contents of the various statements and affidavits (SHCR, pt. 2 at 262–66, paras. 45–53, 57–59, 61–62, 65–69, 72–76, 79–85), the convicting court found that Marous's statements were consistent with the trial

record and with the affidavits of DeYoung and the prosecutors (*id.* at 263, para. 54). Marous was previously determined by the jurors to be credible and the statements in her affidavits also were credible. (*Id.*, paras. 55 & 56.) The court found DeYoung's statements were consistent with those of Marous and Howard and were credible. (*Id.* at 264, para. 60.) As for Roshani's statement, the court found that the jurors' verdict was consistent with their determining him to be credible and that his statements were credible. (*Id.*, paras. 63 & 64.) The court said that Fredericks was well known to the Court and that his statements were credible. (*Id.* at 265, paras. 70 & 71.) The court said that Howard was well known to the Court and that his statements were credible. (*Id.*, paras. 77 & 78.)

As for Hernandez, Cornet, and Hutchinson, the Court found not one credible. (*Id.* at 266, paras. 86–88.)

Shakouri had failed to prove by a preponderance of the evidence that any evidence had been planted and recommended that the claim be denied. (*Id.*, paras. 89 & 90.)

### D. Court of Criminal Appeals.

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

E.     Analysis.

It should be noted that the unsworn statements of Hernandez and Cornet consist almost wholly of hearsay. Neither purports to have first-hand knowledge of the relevant events but purports to relate the statements of Hutchinson. And Hutchinson, the individual who purports to have first-hand knowledge, offers no affidavit or statement. Nor does Shakouri appear to allege that the state court adjudication reflected an unreasonable application of Supreme Court precedent. *See* § 2254(d)(1). He rather seems to allege that the state court's adjudication, in light of the evidence before that court, arose from an unreasonable determination of facts. *See* § 2254(d)(2). The state court took evidence, such as it was, that is, unsworn and hearsay, and made credibility determinations. Those findings are presumed to be correct, and Shakouri must rebut that presumption with clear and convincing evidence. *See* § 2254(e)(1). Shakouri, however, offers no new evidence but merely asks this Court to review the evidence before the state court, make different credibility determinations, and reach different conclusions. He fails, however, to show that the state court adjudication was either legally or factually unreasonable. *See* § 2254(d).

III.   The Facts Pleaded Do Not Describe A *Brady* Claim.

Shakouri alleges that he was deprived of due process when the State failed to disclose evidence that would have been favorable to the defense. (ECF No. 1 at 8.) He alleges that the Prosper police seized and failed to return his

49

cell phone. (*Id.*) On that phone, he says, are text messages corroborating his allegation that Marous was engaged in an extortion scheme. (*Id.*)

Irrespective of the good faith or bad faith of the prosecution, where evidence is material either to guilt or punishment, the suppression by the prosecution of evidence favorable to an accused after a request violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). To establish a *Brady* violation, the petitioner must prove (1) the prosecutor suppressed or withheld evidence (2) that was favorable and (3) material to the defense. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972).

Under *Brady*, the prosecution has no obligation to produce evidence or information already known to the defendant, or that could be obtained through the defendant's exercise of reasonable diligence. *Castillo v. Johnson*, 141 F.3d 218, 223 (5th Cir. 1998). Evidence is not "suppressed" if the defendant knows or should know of the essential facts that would enable him to take advantage of it. *United States v. Runyan*, 290 F.3d 223, 246 (5th Cir. 2002).

In state habeas proceedings, the convicting court found that records indicate that no cell phone was seized by police during the execution of the search warrant. (SHCR, pt. 2 at 201–04.) And after Shakouri's cell phone was taken from him during two pretrial arrests, each time the phone was returned to him. (*Id.* at 205–10.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

Shakouri's *Brady* claim fails on two counts. First, the record before the state habeas court indicates that the State did not withhold the phone. Second, Shakouri complains of text messages on his own cell phone, presumably, sent to him. He would have known of the messages and the State could not have withheld from him knowledge of those messages. Even if the Court were to assume that the messages existed on Shakouri's cell phone and were to assume that the State possessed the cell phone, the State could not withhold from Shakouri his own knowledge of the messages. Had he thought the messages exculpatory, he could have sought to have the phone returned. In short, the facts alleges by Shakouri, taken as true, do not describe a *Brady* violation. He fails to show that the state court's adjudication was legally or factually unreasonable. *See* § 2254(d).

## IV. The State Court's Factual Determination Regarding Shakouri's Perjury Allegation Was Reasonable.

Shakouri alleges that Marous testified falsely. (ECF No. 1 at 8.) He offers the affidavit of Manteghinezhad as evidence. (*Id.*) This claim overlaps that alleging the State fabricated evidence.

The state court noted that Manteghinezhad's affidavit (SHCR, pt. 1 at 121–23) does not state whether he prepared the affidavit himself or whether

he signed a document prepared by someone else. (SHCR, pt. 2 at 268, para. 104.) The court noted that the affidavit appears to have been prepared by someone other than Manteghinezhad because the document contains blank spaces for him to fill in the last four digits of his social security number. (*Id.*, para. 105.) The court noted that Manteghinezhad's statements are unsupported by other evidence. (*Id.* at 269, para. 107.) Also, the court noted, the allegations of Manteghinezhad were raised at trial generally and were rejected by the jurors. (*Id.*, para. 108.) The court found the statements of Marous and of Howard credible and found those of Manteghinezhad not credible. (*Id.*, paras. 109 & 110.) The court found that Shakouri had failed to prove by a preponderance of the evidence that the State knowingly used false evidence at trial or that there was a reasonable likelihood that false testimony affected the jurors' judgment. (*Id.*, para. 111.) The court recommended the claim be denied. (*Id.*, para. 112.)

The Court of Criminal Appeals denied the claim on findings of the trial court. *Ex parte Shakouri*, No. WR-82,402-01.

Shakouri alleges that state court's determination was, in light of the evidence before that court, based on an unreasonable determination of facts. *See* § 2254(d)(2). The findings of the convicting court must, however, be presumed true and Shakouri must rebut that presumption with clear and convincing evidence. *See* § 2254(e)(1). Shakouri offers nothing to rebut the

presumption. He simply asks this Court to review the evidence before the state court and to reach a different conclusion. Shakouri does not show that the adjudication of the state court was legally or factually unreasonable. *See* § 2254(d).

## V.   An Actual Innocence Claim Is Not Cognizable.

Shakouri alleges he is actually innocent. (ECF No. 1 at 8.) A claim of actual innocence based on newly discovered evidence does not state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state proceeding. *Herrera v. Collins*, 506 U.S. 390, 400 (1993). A claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a petitioner must pass to have his otherwise barred constitutional claim considered on the merits. *Id.* at 404. By raising an actual innocence claim, he raises a claim upon which a federal court may not grant habeas corpus relief.

## CONCLUSION

The Director requests that the petition for writ of habeas corpus be dismissed with prejudice and that no certificate of appealability issue.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

ADRIENNE McFARLAND
Deputy Attorney General
 for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division


_____s/ Thomas M. Jones_____
THOMAS M. JONES*
Assistant Attorney General
Criminal Appeals Division
*Attorney-in-Charge
State Bar No. 00784357

P. O. Box 12548, Capitol Station
Austin, Texas  78711-2548
Ph.: (512) 936-1400
Fax No.: (512) 936-1280
E-mail:
Thomas.Jones@texasattorneygeneral.gov

ATTORNEYS FOR RESPONDENT


## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing pleading was served by placing same in the United States Mail, postage prepaid, on this the 25th day of July, 2016, addressed to

Shahram Shakouri
TDCJ-CID No. 01558021
A.M. "Mac" Stringfellow Unit
200 FM 655
Rosharon, TX 77583

_____/s/ Thomas M. Jones_____
THOMAS M. JONES
Assistant Attorney General